IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THREE EXPO EVENTS, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:16-CV-0513-D |
| VS. | § | |
| | § | |
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Three Expo Events, L.L.C. ("Three Expo")—a promoter of adult-content conventions—moves for a preliminary injunction compelling defendant City of Dallas, Texas (the "City" or "City of Dallas")[1] to contract with Three Expo a second time for use of the City's Kay Bailey Hutchison Convention Center ("Convention Center") to hold a three-day adult entertainment expo called "Exxxotica." Concluding that Three Expo has at most shown that the Convention Center is a limited public forum, and that the City has established that its decision to decline to contract with Three Expo a second time was both reasonable and viewpoint neutral, the court denies the motion.[2]

---

[1] Three Expo initially sued several defendants, including the City of Dallas. In its amended complaint, Three Expo names only the City as a defendant.

[2] Pursuant to Fed. R. Civ. P. 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion and order. Three Expo's preliminary injunction motion is before the court under the procedure permitted by Rule 43(c) and is being decided on the papers, with oral argument, but without an evidentiary hearing. *See, e.g., John Crane Prod. Solutions, Inc., v. R2R and D, LLC*, 861 F.Supp.2d 792, 793 n.2 (N.D. Tex. 2012) (Fitzwater, C.J.) (following similar procedure).

I

Three Expo is an event promoter that, along with its affiliates, has for the past decade staged conventions "with erotic, but non-obscene messages" throughout the country.  Compl. ¶ 1.  The City of Dallas is the owner and operator of the Convention Center.  Since 1957, the Convention Center has offered space to a variety of exhibitions, trade shows, and other events.

In 2014 Three Expo, through its director, Jeffrey Handy ("Handy"), contacted City officials about staging an exposition at the Convention Center in calendar year 2015. According to Three Expo, the exposition, called "Exxxotica," was "a positive celebration and educational event for adults—only adults—who were curious about and interested in sex," and was to consist of seminars and booths, contests, product displays, and celebrity appearances to inform, educate, and entertain the attendees.  P. Br. 1.

Three Expo alleges that, in preparation for Exxxotica, it fully disclosed to City officials the nature of the event.  It represented in its promotional literature that Exxxotica would be "a gathering place of all things exotic, erotic, sensual and sexy."  D. App. 55. Three Expo also stated that "[Exxxotica] is not a 'pornographic' event.  There is no live nudity or lewd acts, but rather an upscale gathering of products and services catering to the adult lifestyle."  *Id.*  According to the City, Handy specifically represented that Exxxotica always abides by its "Operating Requirements," which state, *inter alia*, that all patrons and personnel at Exxxotica are prohibited from "[t]he display of less than completely and opaquely covered genitals, pubic region, anus or female breasts below a point immediately

above the top of the areolas"; that sexual activities, including "the fondling or other erotic touching of genitals, pubic region, buttocks, anus or female breasts" are prohibited; that no adult or obscene materials will be visible from any public right of way; and that no one under 18 years of age will be admitted. *Id.* at 58.

In January 2015 the City and Handy, on behalf of "Exotica Texas, LLC,"[3] executed a contract for the three-day Exxxotica event to take place at the Convention Center in August 2015. During a July 29, 2015 meeting with City representatives, the Dallas Police Department ("DPD"), and the Convention Center, Handy agreed that "no one under eighteen (18) would be allowed into the expo, sexual activities would be prohibited and no Penal Code offenses such as obscenity, public lewdness, etc. would be permitted." Compl. ¶ 7.

The 2015 Exxxotica expo took place as scheduled. Three Expo maintains that the event was a "success." P. Br. 2. It contends that ten to fifteen thousand adults attended; that the City of Dallas and area businesses gained revenue from the event; that undercover police officers who attended the expo did not observe any criminal activity, including violations of Texas obscenity laws; and that the Chief of the DPD confirmed that there had been no increase in crime in the Convention Center area during the three-day event.[4]

The City offers a different view of what occurred at the 2015 Exxxotica expo.

---

[3]The City later determined that the entity "Exotica Texas, LLC" does not exist.

[4]The City objects on various grounds to Three Expo's evidence in support of these contentions. Because the court is not relying on this evidence to decide Three Expo's motion, the court overrules the objections without prejudice as moot.

According to the City, Three Expo violated many of the terms of its Operating Requirements, despite Handy's representation that he would monitor compliance with its terms and supervise the show and exhibitor conduct at all times.  For example, the City has introduced evidence that many of the women at Exxxotica wore only pasties or tape covering their nipples and areolas and otherwise exposed their breasts; that sexual activities, including "the fondling or other erotic touching of genitals, pubic region, buttocks, anus or female breasts," D. Br. 5, took place at Exxxotica and were observed and recorded; that Three Expo did not arrange for drapes or screens to be positioned so as to block the view of the exhibit space from the lobby, and that, when entrance and exit doors were open to permit passage, persons in the Convention Center lobby could observe adult material; that identification was not uniformly checked, and attendees of Exxxotica saw a young woman in the exhibit space who did not appear to be age 18; and that Three Expo failed to post signs at the entrance doors prohibiting unlawful conduct, as it had promised.  The City also contends that Three Expo violated state law by permitting lewd acts, assault, and human trafficking to occur at Exxxotica, and violated various provisions of the City of Dallas's sexually oriented business ordinance, Dallas, Tex., City Code § 41A (2015) ( the "SOB Ordinance" or "Chapter 41A").

Subsequent to the 2015 Exxxotica expo, Handy advised the Convention Center that he wanted to schedule a similar convention for 2016.  Convention Center staff provided Handy several tentative dates for 2016, Handy indicated that his preferred dates were May 20-22, 2016, and he asked to be penciled in for those dates.  On January 19, 2016 the Convention Center advised Three Expo that it was still working on getting a contract together

for the Exxxotica event to be held in May.

In early February 2016, Dallas Mayor Mike Rawlings ("Mayor Rawlings") advised the Dallas City Council ("City Council") that he did not want Exxxotica to return to Dallas in 2016. Despite the fact that the City Attorney had concluded that the First Amendment prohibited the City from banning Exxxotica and that Chapter 41A did not apply to Three Expo's temporary event at the Convention Center, Mayor Rawlings asked the City Attorney's Office to draft a resolution directing the City Manager not to enter into a contract with Three Expo for lease of the Convention Center. On February 10, 2016, by a vote of eight to seven, the City Council passed Resolution No. 160308 ("Resolution"), which provides:

> WHEREAS, Three Expo Events, LLC requests to contract with the City to hold a three-day adult entertainment expo at the Dallas Convention Center; Now, Therefore,
>
> BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DALLAS:
>
> Section 1. That the City Council directs the City Manager to not enter into a contract with Three Expo Events, LLC, for the lease of the Dallas Convention Center.
>
> Section 2. That this resolution shall take effect immediately from and after its passage in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so resolved.

Compl. Ex. 1 (bold font omitted). Three Expo alleges that the City Council passed the resolution because its members disliked Exxxotica's subject matter.

On February 24, 2016 Three Expo brought this lawsuit against the City of Dallas and

various City officials in their official capacities.  It asserts claims under 42 U.S.C. § 1983, alleging, *inter alia*, that the City's denial of the use of municipal facilities for the Exxxotica convention based solely on the personal opinions or beliefs of a slim majority of the City Council as to the subject matter or content of the production violates Three Expo's First and Fourteenth Amendment rights.  In addition to damages and declaratory relief, it seeks an injunction enjoining the City of Dallas from enforcing the Resolution and ordering the City to honor its commitment to enter into a contract with Three Expo so that it can hold its exposition on May 20-22, 2016 at the Convention Center.[5]

On March 4, 2016 Three Expo filed the instant motion for a preliminary injunction, which the City of Dallas opposes.  Three Expo asks the court to enjoin the City from interfering with the 2016 Exxxotica expo that Three Expo seeks to hold at the Convention Center, and ordering that the City enter into a contract with Three Expo for a lease at the Convention Center for a three-day adult entertainment expo on May 20-22, 2016, in accordance with their prior agreements and course of dealing.  *Amici Curiae* The State of Texas and The Dallas Citizens Council have filed a brief in support of the City and in opposition to Three Expo's preliminary injunction motion.  The court has heard oral argument.

---

[5]After briefing was complete on its motion for a preliminary injunction, Three Expo amended its complaint to add a claim that Chapter 41A, if applied to Three Expo, is unconstitutional under the First and Fourteenth Amendments.

II

Before the court decides the merits of Three Expo's motion, it must first address the City's contention that Three Expo lacks standing.

The standing doctrine addresses the question of who may properly bring suit in federal court, and it "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish standing, a plaintiff must meet both constitutional and prudential requirements. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001).

The City contends that Three Expo lacks constitutional standing, which requires that a litigant establish three elements: (1) an injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendants' actions; and (3) that the injury will likely be redressed by a favorable decision. *See, e.g., Bennett v. Spear*, 520 U.S. 154, 167 (1997); *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). According to the City, Three Expo cannot meet the "redressability" requirement of constitutional standing because the SOB Ordinance prohibits Exxxotica from operating at the Convention Center, and because Exxxotica is not eligible for a contract to operate at the Convention Center regardless of the Resolution, Three Expo's alleged harm from the Resolution is not redressable. Three Expo does not respond specifically to the City's standing argument.

Three Expo has adequately pleaded the facts necessary for the court to conclude that it has Article III standing.  The City's argument that the court cannot issue the relief Three Expo requests goes to the *merits* of Three Expo's claims rather than to the ability of a court order to redress Three Expo's alleged injury.  Three Expo has pleaded a constitutional injury—the deprivation of its First Amendment rights—that is capable of being redressed by the relief Three Expo seeks—an injunction restraining the City from enforcing the Resolution and ordering the City to enter into a contract with Three Expo for its exposition on May 20-22, 2016 at the Convention Center.  Accordingly, the court holds that Three Expo has adequately pleaded the redressability element of Article III standing.

### III

The court now turns to the merits of Three Expo's motion for a preliminary injunction.

To obtain a preliminary injunction, Three Expo must establish the following: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm the injunction may do to defendants; and (4) that granting the preliminary injunction will not disserve the public interest.  *E.g., Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (unpublished table decision).  Three Expo must satisfy all four requirements.  "A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'"  *Id*. (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)).  "The decision to grant a preliminary

-8-

injunction 'is to be treated as the exception rather than the rule.'" *Id.* (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (stating that movant must "clearly carr[y] the burden of persuasion")). "'The decision whether to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden.'" *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F.Supp.2d 792, 794 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *TGI Friday's, Inc. v. Great Nw. Rest., Inc.*, 652 F.Supp.2d 763, 767 (N.D. Tex. 2009) (Fitzwater, C.J.)). In addition, mandatory preliminary relief, such as Three Expo seeks,[6] "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted).

"Findings of fact and conclusions of law disposing of a request for a preliminary injunction are not binding at trial on the merits." *Mylett v. Jeane*, 910 F.2d 296, 299 (5th Cir. 1990) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)). None of the court's conclusions at the preliminary injunction stage carries over to the determination of the merits of Three Expo's claims. *See, e.g., Zen Music Festivals, L.L.C. v. Stewart*, 2004 WL 1660452, at *4 (N.D. Tex. July 23, 2004) (Fitzwater, J.) (granting defendants' motion for

---

[6]Three Expo requests in part that the court order the City of Dallas to enter into a contract with Three Expo for a lease at the Convention Center for a three-day adult entertainment expo on May 20-22, 2016, in accordance with their prior agreements and course of dealing. This aspect of the requested relief is mandatory rather than prohibitory.

summary judgment after having granted plaintiff's earlier motion for preliminary injunction).

Accordingly, that Three Expo has not succeeded on its preliminary injunction motion does

not necessarily mean that, with further discovery and development of the evidentiary record,

it cannot prevail on the merits.

IV

The court need only decide whether Three Expo has established a substantial

likelihood that it will prevail on the merits of its action against the City.[7]

A

The First Amendment Free Speech Clause provides that "Congress shall make no law

. . . abridging the freedom of speech."[8] U.S. Const. amend. I.  But the government "need not

permit all forms of speech on property that it owns and controls."  *Int'l Soc'y for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *see also U.S. Postal Serv. v. Council*

---

[7]The City maintains that, under the doctrine of "constitutional avoidance," the court should rule that the City was justified in deciding not to sign a second contract for Exxxotica, and should "follow the well-established rule of constitutional avoidance and decline to decide the constitutional issue raised by Plaintiff."  D. Br. 19.  In support of this argument, the City relies on *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), in which the Supreme Court stated that "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  *Id.* at 445-46.  The court disagrees with the City's assertion that the general principle set forth in *Lyng* applies here.  Three Expo is seeking a preliminary injunction to remedy what it maintains is a deprivation of its First Amendment right to free speech.  The constitutional question is not a collateral one that can be avoided in the exercise of judicial restraint.

[8]The First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  *See, e.g., Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir. 1999) (citing *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937)).

*of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."). It is well settled that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (citation omitted). Accordingly, a "speaker's right to access government property is determined by the nature of the property or 'forum'" created by the government. *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116 (5th Cir. 1992) (citation omitted); *see also Perry Educ. Ass'n*, 460 U.S. at 44 ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").

Claims under the First Amendment Free Speech Clause are typically analyzed in three steps. First, the court must "decide whether [the activity at issue] is speech protected by the First Amendment, for, if it is not, [the court] need go no further." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, assuming the activity "is protected speech, [the court] must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* And, third, the court must assess whether the government's justifications for restricting speech in the relevant forum "satisfy the requisite standard." *Id.*

B

In this case, the first step requires no lengthy discussion.  At oral argument, counsel for the City acknowledged that "there are portions of what happened at Exxxotica that are within the outer ambit of the First Amendment." Tr. 29.[9]  And in the City's brief it "accept[s] that pornography is presumptively permissible speech, as reflected in the City's longstanding SOB ordinance that respects the right of free expression, while regulating negative secondary effects." D. Br. 46.  Accordingly, the court assumes for purposes of this decision that at least some of the content of the Exxxotica expo is protected under the First Amendment.

C

> Even protected speech is not equally permissible in all places and at all times.  Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.

*Cornelius*, 473 U.S. at 799-800.  "Rather, the extent of scrutiny given to a regulation of speech—in effect, how [the court] examine[s] the directness with which it promotes the government's goals and the degree to which it burdens speech—depends on whether the regulation applies in a *public* or *nonpublic* forum." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010).

---

[9]Citations to the hearing transcript are to a preliminary copy that is subject to revision when filed of record by the court reporter.

The Supreme Court has recognized four distinct categories of forums:[10] (1) traditional public forum, (2) designated public forum, (3) limited public forum, and (4) nonpublic forum. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, ___ U.S. ___, 135 S.Ct. 2239, 2250-51 (2015).[11] "Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (citing *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (per curiam)). "In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n*, 460 U.S.

---

[10]"The preferred plural is *forums*, not *fora*." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 373 (2d ed. 1995) (emphasis in original).

[11]Although in *Walker* the Supreme Court recognized these four distinct categories of forums, the Supreme Court and the Fifth Circuit have at other times used different or overlapping terminology to describe the same sorts of forums. *See, e.g., Ark. Educ. Television Comm'm v. Forbes*, 523 U.S. 666, 677-78 (1998) (listing the types of forums as traditional public forum, designated public forum, nonpublic forum—what *Walker* and other cases call a "limited public forum"—and non-forum); *Cornelius*, 473 U.S. at 802 (identifying three types of forums: "the traditional public forum, the public forum created by government designation, and the nonpublic forum"); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757-58 (5th Cir. 2010) (listing three categories of forum: "(1) traditional and designated public forums; (2) limited public forums; and (3) nonpublic forums"); *see also Am. Freedom Defense Initiative v. King Cnty., Wash.*, ___ U.S. ____, 136 S.Ct. 1022, 1022 (2016) (Thomas, J., dissenting from the denial of certiorari) (implying that a nonpublic forum is merely another name for a limited public forum). The court will use the terminology employed by the Court in *Walker*.

at 45 (citing *Carey v. Brown*, 447 U.S. 455, 461 (1980)).  "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.*

In addition to traditional public forums, "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."  *Cornelius*, 473 U.S. at 802; *see also Walker*, 135 S.Ct. at 2250 (describing a "designated public forum" as one "which exists where 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose.'" (citation omitted)); *Hotel Emps. & Rest. Emps. Union, Local 100 v. N.Y.C. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002) (noting that a designated public forum is one intentionally "opened for all types of expressive activity").  "A prototypical example of a designated forum is a public library."  *Flaherty v. Knapik*, 999 F.Supp.2d 323, 334 (D. Mass. 2014) (citation omitted).  The state's power to control a speaker's access to these "designated public forums" is "subject to the same first amendment constraints that apply to traditional public forums."  *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989).

"Public property which is not by tradition or designation a forum for public communication is governed by different standards."  *Perry Educ. Ass'n*, 460 U.S. at 46.  In contrast to designated public forums, "limited public forums" describe forums opened for public expression of a limited type—for example by topic of discussion, the manner of

communication, or the class of individuals permitted to speak. *Chiu*, 260 F.3d at 346. When the government creates a limited public forum of this sort, the government is not required to, and often does not, allow persons to engage in every type of speech. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Rather, "'the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Perry Educ. Ass'n*, 460 U.S. at 46 (quoting *U.S. Postal Serv.*, 453 U.S. at 129-30). Accordingly, when the government creates a limited public forum, it may restrict the expression that takes place within the forum so long as the restriction "(1) does 'not discriminate against speech on the basis of viewpoint,' and (2) is 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club*, 533 U.S. at 106-07); *see also Perry Educ. Ass'n*, 460 U.S. at 46 ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (citation omitted)).

Finally, there is the "nonpublic forum," which describes public property that is not by tradition or designation open for public communication. "[A] forum may be considered *nonpublic* where there is clear evidence that the state did not intend to create a public forum or where the nature of the property at issue is inconsistent with the expressive activity, indicating that the government did not intend to create a public forum." *Estiverne*, 863 F.2d at 376. Where the government "is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be

subjected to the heightened review to which its actions as a lawmaker may be subject." *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 678; *see also Walker*, 135 S.Ct. at 2251.  As with a limited public forum, the government can restrict access to a nonpublic forum as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998).

D

Three Expo contends that the Convention Center is public property that the City "has opened for a place of expressive activity." P. Br. 7 (citation omitted).  It cites evidence about the size and capacity of the Convention Center as represented on the Convention Center's website, and concludes that the Convention Center is therefore a public forum, subject to the rights secured by the First Amendment.

The City and *Amici* dispute that the Convention Center is a public forum.  D. Br. 43; Amici Br. 3.  *Amici* contend that, because the City, "acting as a proprietor," manages the Convention Center as a commercially useful asset, the Convention Center is a nonpublic forum.  Amici Br. 3.  They cite the City's annual budget[12] in support of their argument that

_____

[12]*Amici* point out that the City's annual budget lists the Convention Center under the "Economic Vibrancy" focus area rather than the "Culture, Arts, Recreation and Education" focus area; describes the Convention Center as "one of the region's most powerful economic engines [that] effectively generates dollars that reduce the burden to local taxpayers [and] create[s] region-wide jobs and economic benefits"; and states that the City department that oversees the Convention Center "serve[s] as an economic engine for the City of Dallas, through efficient management, marketing and promotion of the [Convention Center]." Amici Br. 4 (alterations in original) (quoting City of Dallas Annual Budget for Fiscal Year 2015-

the Convention Center is a commercial enterprise intended to promote economic development, that the City "'is acting as a proprietor, managing its internal operations'" when it manages the Convention Center, and that the City's maintenance and management of the Convention Center are for the purpose of fueling economic growth, not for encouraging public discourse. *Id.* at 4 (quoting *Walker*, 135 S.Ct. at 2251). *Amici* recognize that "[s]peech does, of course, take place at the Convention Center," but they argue that because the City did not create the Convention Center for purposes of providing a forum for expressive activity, the presence of speech does not convert the Convention Center into a public forum. *Id.* at 5. Rather, they posit that any speech at the Convention Center "is simply the byproduct of the commercial enterprise." *Id.* at 6. Finally, *Amici* contend that the nature of a particular forum is a highly fact-intensive inquiry, and they cite three cases in which courts have found municipal convention centers and similar venues to be nonpublic forums.

E

It is indisputable that the Convention Center is *not* a traditional public forum. It is rented for commercial purposes. It is not akin to a sidewalk, street, or park "that the public since time immemorial has used for assembly and general communication." *Fairchild*, 597 F.3d at 758 (citation omitted). Instead, the question in this case is whether Three Expo has demonstrated that the Convention Center is at least a *designated* public forum, which would

—————————————

2016).

place a heavier burden on the City to show that its action did not infringe Three Expos' First Amendment rights, or is a *limited* public forum, which imposes a lower burden. "The action—in this case and most others—exists at the line between designated and limited public forums." *Id.* (citing *Chiu*, 260 F.3d at 346 ("Though the Supreme Court now clearly distinguishes designated public forums subject to strict scrutiny from limited public forums that are not, the line separating the two categories remains undefined.")). Determining the nature of the forum is a fact-intensive inquiry. *See*, *e.g.*, *Verlo v. Martinez*, 2016 WL 1395205, at *24 (10th Cir. Apr. 8, 2016) ("[F]orum status is an inherently factual inquiry about the government's intent and the surrounding circumstances that requires the district court to make detailed factual findings."); *Hopper v. City of Pasco*, 241 F.3d 1067, 1091 (9th Cir. 2001) ("[W]hether a government entity intended to open a forum is an 'inherently factual inquiry that should not be resolved without due attention to an underlying record.'" (quoting *Air Line Pilots Ass'n, Int'l v. Dept. of Aviation of the City of Chicago*, 45 F.3d 1144, 1152 (7th Cir. 1995))); *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1014 (D.C. Cir. 1988) ("[T]he question of whether RFK Stadium is a public forum is inherently a factual one."); *Wandering Dago Inc. v. New York State Office of Gen. Servs.*, 992 F.Supp.2d 102, 123 (N.D.N.Y. 2014) ("It is clear that the forum analysis that the Court must undertake is a fact intensive analysis.").

-18-

In *Cornelius* the Supreme Court explained:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.

*Cornelius*, 473 U.S. at 802 (citations omitted); *see also Fairchild*, 597 F.3d at 758-59 ("'In distinguishing between the two types of forums, our precedent directs us to focus on two factors: (1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue.'" (quoting *Chiu*, 260 F.3d at 346)).  In deciding that the forum at issue in that case (a charity drive aimed at federal employees) was not a designated public forum, the Court was persuaded, *inter alia*, by the fact that "neither [the government's] practice nor its policy [was] consistent with an intent to designate the [charity drive] as a public forum open to all tax-exempt organizations," and that "there [was] no evidence suggesting that the granting of the requisite permission [was] merely ministerial." *Cornelius*, 473 U.S. at 804.

Three Expo does not offer any evidence that, in creating or operating the Convention Center, the City has intentionally opened up a nontraditional forum for public discourse. *See Cornelius*, 473 U.S. at 802; *Walker*, 135 S.Ct. at 2250.  In its brief, Three Expo contends that, like the municipal auditorium in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), "the convention center is a place for like-minded people to convene and express and

exchange ideas." P. Br. 7.  But in *Southeastern Productions* there was evidence that the City

of Chattanooga had intentionally designated its Memorial Auditorium as a place for public

discourse.[13]  Three Expo has presented no such evidence here.  Instead, it relies on statistics

about the size and capacity of the Convention Center to argue that the Convention Center "is,

therefore, a public forum, subject to the rights secured by the First Amendment."  *Id*. at 8.

The capacity of the Convention Center to host an event such as Exxxotica, however, does not

establish, or even necessarily support, the premise that the City has designated the

Convention Center to be the functional equivalent of a quintessential public forum.  Nor are

statements on the Convention Center's website that "the Convention Center is big and big

things happen there," Tr. 9, sufficient to establish, as Three Expo contended during oral

argument, that the Convention Center is a designated public forum because it is "open to

anyone who wants to stage an expo or a trade show [there]."  *Id*. at 10.[14]  Although Three

---

[13]The dedication booklet expressly stated: "It will be (the board's) endeavor to make
(the auditorium) the community center of Chattanooga; where civic, educational[,] religious,
patriotic and charitable organizations and associations may have a common meeting place
to discuss and further the upbuilding and general welfare of the city and surrounding
territory. . . . its purpose will be devoted for cultural advancement, and for clean, healthful,
entertainment which will make for the upbuilding of a better citizenship."  *Se. Promotions*,
420 U.S. at 549 n.4.

[14]In *Arkansas Educational Television Commission* the Court explained the distinction
between "general access," which indicates that the property is a designated public forum, and
"selective access," which indicates that the property is a nonpublic forum:

> On one hand, the government creates a designated public forum
> when it makes its property generally available to a certain class
> of speakers[.] On the other hand, the government does not create
> a designated public forum when it does no more than reserve
> eligibility for access to the forum to a particular class of

Expo may be able to do so at a later stage in this litigation, it has not supported its motion for a preliminary injunction with *any* evidence that would permit the court to find that the City has opened up the Convention Center for all types of expressive activity, *see Hotel Employees*, 311 F.3d at 545, or that members of the public who wish to use Convention Center space can do so without first obtaining the City's permission, *see Arkansas Educational Television Commission*, 523 U.S. at 679-80.  Without establishing that the Convention Center is a designated public forum, Three Expo is not entitled to the type of review courts use for those types of forums.

Accordingly, the court concludes that Three Expo has not met its burden of establishing a substantial likelihood of success on the essential element that the Convention Center is a designated public forum and, in turn, that the Resolution is subject to strict scrutiny.[15] As explained, determining the status of a forum is highly fact-intensive.  *See Verlo*, 2016 WL 1395205, at *24; *Hopper*, 241 F.3d at 1091; *Stewart*, 863 F.2d at 1014. Three Expo has failed to adduce any facts that would support the finding that the Convention Center is a designated public forum.   Accordingly, the court must assume that the

_____

> speakers, whose members must then, as individuals, "obtain permission."

*Ark. Educ. Television Comm'n*, 523 U.S. at 679 (quoting *Cornelius*, 473 U.S. at 804).

[15]Nothing in the court's decision today will preclude Three Expo from attempting to prove at a later procedural stage of the case that the Convention Center is a quintessential public forum or a designated public forum.  *See supra* § III (noting that none of the court's conclusions at the preliminary injunction stage carries over to the determination of the merits of Three Expo's claims).

Convention Center is either a limited public forum or a nonpublic forum[16] and determine, at the next step of the First Amendment analysis, whether the City has established that the City's decision was reasonable and viewpoint neutral.  *See, e.g., Ark. Educ. Television Comm'n*, 523 U.S. at 677-78 ("the government can restrict access to a nonpublic forum as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." (alteration in original) (citations omitted)); *Fairchild*, 597 F.3d at 758 ("The government may restrict speech in these limited public forums, as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum.'" (quoting *Chiu,* 260 F.3d at 346)).

F

The court now considers whether the City has established that its decision not to contract with Three Expo in 2016 was reasonable in light of the Convention Center's purpose.  *See Perry Educ. Ass'n*, 460 U.S. at 50-51.  In analyzing this question, the court is

---

[16]The standard under a First Amendment forum analysis for a limited public forum and a nonpublic forum is the same.  *Chiu*, 260 F.3d at 347 ("As with limited public forums, '[t]he government can restrict access to a nonpublic forum "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."'" (alterations in original) (quoting *Ark. Educ. Television Comm'n*, 523 U.S. at 677-78)); *see also McMahon v. City of Panama City Beach*, 2016 WL 1449680, at *7 n.8 (N.D. Fla. Apr. 12, 2016) (noting that there does not appear to be a consensus among courts as to whether there is a distinction between a "limited public forum" and a "nonpublic forum," but that "[r]egardless of nomenclature, government regulation of speech on government property that is not a traditional or designated public forum must be reasonable and viewpoint neutral." (citations omitted)).

not confined to evidence of the City's pre- or contemporaneously-expressed rationale for enacting the Resolution.  *Cf. Fantasy Ranch Inc. v. City of Arlington, Tex.*, 459 F.3d 546, 560 (5th Cir. 2006) (stating in context of time, place, and manner ordinance that local government can justify challenged ordinance based both on evidence developed prior to ordinance's enactment and adduced at trial).  Nor should the court focus on the expressed views of individual councilmembers.  *See, e.g., E. High Gay/Straight All. v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F.Supp.2d 1199, 1204 (D. Utah 1999) ("Generally, the personal views and underlying motives of legislators in carrying out their legislative function and in adopting general policies and rules fall beyond the reach of judicial scrutiny.")

The City maintains that it has "good-faith, lawful, constitutional reasons to exercise its freedom to decline to enter into a second contract with [Three Expo]," including Three Expo's commission of "fraud, crimes, breach of contract, and violations of the City's [SOB] ordinance."[17] D. Br. 21.  It has adduced evidence that, although Handy agreed to ensure that the exhibitors and attendees of Exxxotica would comply with all state laws, in fact multiple violations of the law, including multiple recorded instances of public lewdness by Exxxotica exhibitors, took place during Exxxotica in 2015.  This evidence includes video of conduct at Exxxotica that two DPD Deputy Chiefs and the DPD Assistant Chief concluded constituted acts of public lewdness; and evidence that the DPD arrested nine "Johns," who

---

[17]Although the City primarily presents its arguments in support of its assertion that Three Expo has "unclean hands," its rationale for refusing to enter into a second contract with Three Expo is more appropriately addressed in the context of whether the City's actions were "reasonable."

had responded to ads that the DPD had posted on a website that referred to "Exxotica" or "Exxxotica."  The City has also produced evidence that the type of conduct that occurred at Exxxotica in 2015 would ordinarily fall squarely within the City's SOB ordinance,[18] and that at least some of the conduct that occurred at Exxxotica is expressly prohibited by that ordinance.[19]  Finally, even setting aside any criminal acts that occurred at Exxxotica 2015 or conduct that would ordinarily violate the SOB Ordinance, the City contends that Three Expo

---

[18]Chapter 41A defines "Sexually Oriented Business" to include, *inter alia*, a "nude model studio," an "adult cabaret," and a "commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer."  Dallas, Tex., City Code § 41A-2(31).  Regardless of whether Chapter 41A, as a whole, applies to Three Expo's temporary use of the Convention Center, the City has provided evidence that the conduct that occurred at Exxxotica in 2015 clearly falls within the definition of "sexually oriented business," as that term is defined by Chapter 41A.

[19]For example, Chapter 41A defines "nude model studio" as "any place" where "a person who appears in a state of nudity or displays 'specified anatomical areas' is provided to be observed by paying patrons.  *Id.* § 41A-2(23).  "Specified anatomical areas" include, "when less than completely and opaquely covered . . . any buttock[ or] any portion of the female breast or breasts that is situated below a point immediately above the top of the areola[.]"  *Id.* § 41A-2(33).  Chapter 41A's "no touch" rule states, in pertinent part:

> (e) An employee of a nude model studio, while exposing any specified anatomical areas, commits an offense if the employee touches a customer or the clothing of a customer.
> (f) A customer at a nude model studio commits an offense if the customer touches an employee who is exposing any specified anatomical areas or touches the clothing of the employee.

*Id.* § 41A-16.  The City has produced video evidence of Exxxotica employees with less than completely and opaquely covered buttocks and breasts touching and being touched by customers of Exxxotica.  This conduct would clearly violate Chapter 41A-16.

-24-

breached numerous aspects of its agreement with the City for Exxxotica 2015,[20] and that "[i]n light of Plaintiff's failure to abide by the terms of its previous contract with the City, the Court should not order the City to enter into a new contract with Plaintiff." D. Br. 25; *see also id.* at 27 ("The Court should not order the City to enter into a new contract with Plaintiff, who has demonstrated that his promises are unreliable.").

On this record, the City has proved that its posited justifications for refusing to enter into a contract with Three Expo for Exxxotica in 2016 were reasonable in light of the purpose to be served by the Convention Center. As *Amici* point out in their brief, the Convention Center is a commercial enterprise intended to promote economic development and revenue

---

[20]The City contends and produces evidence that Three Expo

> promised the City that Exxxotica would not permit exhibitors or patrons to engage in "sexual activities," defined to include fondling or other erotic touching of buttocks or female breasts. Plaintiff promised the City that Exxxotica would not permit exhibitors or patrons to display female breasts below a point immediately above the top of the areolas. Plaintiff promised the City that no adult or obscene materials would be visible from any public right of way. Plaintiff promised that he would monitor compliance with the terms and conditions of the agreement and supervise the show and exhibitor conduct at all times. He did not live up to any of these promises. . . . Instead, exhibitors and patrons engaged in "sexual activities" and appeared in a state of nudity that violated Plaintiff's agreement with the City, adult material was visible from the Convention Center lobby, and Plaintiff did not monitor compliance with the terms and conditions of the agreement and supervise the show and exhibitor conduct at all times.

D. Br. 26-27 (citations omitted).

generation for the City.  It is reasonable, in light of this purpose, for the City to refuse to

enter into a contract with Three Expo.  First, there is evidence that shows that the City

reasonably believed that Three Expo made fraudulent misrepresentations and breached

certain aspects of its agreement with the City in connection with Exxxotica 2015.  It is

reasonable for the City to choose not to enter into a second contract with a party with whom

it has previously dealt and who breached a prior agreement.  There was conduct at Exxxotica

in 2015—by no means isolated—that would ordinarily be regulated under the City's SOB

Ordinance:[21] an ordinance that has been upheld as a constitutional time, place, and manner

statute.  *See Baby Dolls Topless Saloons, Inc. v. City of Dallas, Tex.*, 295 F.3d 471, 482 (5th

Cir. 2002).  Even if the court assumes *arguendo* that the SOB Ordinance does not apply to

Three Expo's temporary use of the Convention Center, it is reasonable for the City to

conclude that the type of conduct that it normally regulates under that ordinance should not

be permitted at its Convention Center.  Finally, the very secondary effects that the SOB

Ordinance targets, including acts of public lewdness that would violate Tex. Penal Code Ann.

---

[21]Chapter 41A was enacted to

> regulate sexually oriented businesses to promote the health,
> safety, morals, and general welfare of the citizens of the city; to
> establish reasonable and uniform regulations to prevent the
> continued concentration of sexually oriented businesses within
> the city; and to minimize the deleterious secondary effects of
> sexually oriented businesses both inside such businesses and
> outside in the surrounding communities.

Dallas, Tex., City Code § 41A-1.

§ 21.07 (West 2016), *actually occurred* at the 2015 Exxxotica expo.

Based on the record developed thus far, the court finds that the City has established that its decision not to contract with Three Expo in 2016 was reasonable in light of the purpose of the Convention Center.  *See Cornelius*, 473 U.S. at 808 ("The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." (emphasis in original)).  The City could have reasonably believed, having observed what transpired at Exxxotica in 2015, that it would be incongruous with the purpose of the Convention Center—i.e., to promote the economic development of the City—to host an event that would likely include public lewdness and other conduct that the City's SOB ordinance would permit it to regulate otherwise.

## G

Finally, the court considers whether the City has established that its decision not to enter into a contract with Three Expo was viewpoint neutral.

Three Expo contends that the City's "refusal to permit the City Manager to enter into a contract with Plaintiff to present its event at the convention center was based solely on [the City Councilmembers'] disagreement with the *content* of the expression presented at Exxxotica."  P. Br. 11 (emphasis added).  But in the First Amendment context, where the forum is limited or nonpublic, a *content*-based restriction on speech is permitted as long as it is designed to confine the forum to the limited and legitimate purposes for which it was created.  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995);

-27-

*see also State of Tex. v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1080 (5th Cir. 1995) ("[T]he government is not required to act with content neutrality in limiting access to a nonpublic forum and may make 'distinctions in access on the basis of . . . speaker identity.'" (quoting *Perry Educ. Ass'n*, 460 U.S. at 49)).  It is only *viewpoint* discrimination that "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger*, 515 U.S. at 830 (emphasis added).

The distinction between a permissible *content*-based restriction on speech and an impermissible *viewpoint*-based restriction on speech, however, is "not a precise one." *Id.* at 831.  "[D]iscrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination." *Id*. at 830-31.  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  Viewpoint discrimination is thus an egregious form of content discrimination."  *Id*. at 829 (citation omitted). Nonetheless, "[t]he fact that the State wishes to exclude only one group with a certain viewpoint does not alone make the exclusion viewpoint-based." *Knights of Ku Klux Klan*, 58 F.3d at 1081 ("The State's desire to prevent the participation of the Klan in the [adopt-a-highway] Program is not due to the opinions of the Klan, but rather results from the foreseeable impact of Program participation by the Klan, given the past conduct of the Klan, upon the peace and privacy of the project residents and use of the State's highways.").

The preliminary injunction record does not support the finding that the City was

actually motivated by a desire to suppress Three Expo's viewpoint.[22]  On its face, the

Resolution is both *content* and *viewpoint* neutral.  Three Expo makes much of the fact that

the Resolution states, "WHEREAS, Three Expo Events, LLC requests to contract with the

City to hold a *three-day adult entertainment expo* at the Dallas Convention Center."

(emphasis added; bold font omitted).  But this recital merely describes the event that Three

Expo is seeking to hold.  Even Three Expo cannot dispute that Exxxotica *is* a "three-day

adult entertainment expo."  In fact, it uses this phrase in its proposed form of preliminary

injunction.  *See* ECF Doc. 6-1 at 2 (requesting, in part, that the City "be ordered to enter into

a contract with Expo for the lease of the Dallas Convention Center for a *three-day adult

entertainment expo* on May 20-22, 2016 in accordance with their prior agreements and

course of dealing.") (emphasis added).  Moreover, Three Expo has not presented any

evidence that, in voting for the Resolution, City councilmembers were motivated by a desire

to suppress Three Expo's *viewpoint*.  As the City points out in its brief, Three Expo has not

clearly articulated any particular viewpoint against which the City could have discriminated.

*See* D. Br. 45 ("It is impossible for Defendant[] to have engaged in viewpoint discrimination

because Plaintiff's viewpoint is not clear.").  At oral argument, Three Expo's counsel

---

[22]In assessing viewpoint neutrality, the court is required to look beyond the
government's reasonable justifications for the restriction on speech. *See Cornelius*, 473 U.S.
at 811-12 (noting that "[t]he existence of reasonable grounds for limiting access to a
nonpublic forum . . . will not save a regulation that is in reality a facade for viewpoint-based
discrimination," and remanding case where the plaintiffs had "offered some evidence to cast
doubt on" the genuineness of the government's "reasonable grounds for excluding certain
groups from" government charity drive).

identified during the following exchange what Three Expo maintains is the viewpoint being suppressed:

> THE COURT: On that last point, the amici differentiate between discrimination based on content and viewpoint.  What do you maintain is the viewpoint of your client that's being suppressed. Not the content but the viewpoint.
>
> [THREE EXPO'S COUNSEL]: The viewpoint — and I will answer that but one thing I think we should make clear is the Supreme Court has said that viewpoint discrimination is a particularly egregious form of content discrimination.  They're inseparable except that viewpoint discrimination is even more egregious.  The viewpoint that the City Council proclaimed was inimical in their view to the best interest of the City of Dallas was the viewpoint that sexually explicit materials are good, that people should be exposed to seminars and healthy talks about human sexuality.  The view is one that presents a positive view of human sexuality and of the right of people to have an access to sexually explicit materials and sexually explicit entertainment.

Tr. 11-12.  Essentially, Three Expo's counsel asserted that, in refusing to contract with Three Expo, the City Council was motivated by a desire to suppress Three Expo's point of view that (1) sexually explicit materials are good, (2) people should be exposed to seminars and healthy talks about human sexuality, (3) one should have a positive view of human sexuality, and (4) people have a right to have an access to sexually explicit materials and sexually explicit entertainment.  But Three Expo has failed to present any evidence that is sufficient to rebut the City's showing that it declined to contract with Three Expo based on beliefs about the expected *content* of the Exxxotica expo rather than opposition to any of these four viewpoints.

-30-

H

Based on the facts developed thus far, the court finds that Three Expo has not demonstrated a substantial likelihood of success on the merits. Three Expo has failed to establish that the Convention Center is anything more than a limited public forum. And the City has established that its refusal to enter into a contract for an Exxxotica expo in 2016 was both reasonable and viewpoint neutral.[23]

---

[23]Three Expo appears to argue that the Resolution is an unconstitutional prior restraint on speech. A prior restraint exists "when the government can deny access to a forum for expression before the expression occurs." *United States v. Frandsen*, 212 F.3d 1231, 1236-37 (11th Cir. 2000); *see also Roberts v. Haragan*, 346 F.Supp.2d 853, 869 (N.D. Tex. 2004) (Cummings, J.) ("A 'prior restraint' is any statute, ordinance, or policy that vests an administrative official with discretionary power to control in advance the use of public places for First Amendment activities." (citing *Kunz v. People of the State of N.Y.*, 340 U.S. 290, 293-94 (1951))). Prior restraints are generally disfavored and subject to strict scrutiny. *Se. Promotions*, 420 U.S. at 558 ("Any system of prior restraint, however, comes to this Court bearing a heavy presumption against its constitutional validity" (citations omitted)). Prior restraints in a nonpublic forum, however, have been upheld as long as they were reasonable and viewpoint neutral. *See Cornelius*, 473 U.S. at 813 (holding that a federal charity drive, a nonpublic forum, could limit participation to a number of select charities as long as the restriction was reasonable and viewpoint neutral); *Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540 (7th Cir. 1996) (holding that school officials could prevent a student from distributing invitations in a public elementary school, a nonpublic forum, because the restraint was reasonable). A nonpublic forum by definition is characterized by "selective access," *Arkansas Educational Television Commission*, 523 U.S. at 679, which necessarily means that the state can select or limit who may speak and what may be said prior to its expression as long as the restrictions meet the requirements of reasonableness and viewpoint-neutrality. Accordingly, a restriction on expression that would otherwise be deemed a prior restraint if it had been applied in a public forum is valid in a nonpublic forum as long as it is reasonable and viewpoint neutral. *See id.* (holding that state-sponsored televised election debate was nonpublic forum, and state officials could exercise broad editorial discretion in deciding which candidates to invite as long as the decisions were reasonable and viewpoint neutral); *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 270, 274 (1988) (concluding that high school newspaper was nonpublic forum and that prepublication control by school officials was reasonable); *Greer v. Spock*, 424 U.S. 828, 838, 840 (1976)

-31-

V

Because the party seeking a preliminary injunction must carry the burden of persuasion on all four factors, and because Three Expo has failed to carry its burden of showing a substantial likelihood of success on the merits, the court need not address the remaining three factors. *See, e.g., TRAVELHOST, Inc. v. Figg*, 2011 WL 6009096, at \*5 (N.D. Tex. Nov. 22, 2011) (Fitzwater, C.J.) (citing *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (per curiam)) (affirming denial of preliminary injunctive relief on ground that movant had failed to show irreparable injury, and pretermitting discussion of other three factors).

\*   \*   \*

Accordingly, Three Expo's motion for a preliminary injunction is denied.

**SO ORDERED**.

Apri1 21, 2016.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

(concluding that military base was nonpublic forum, and that military officials could require prior approval before allowing distribution of political campaign literature, and noting that restrictions had not been applied "irrationally").